UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| DERRICK WINSTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:08-CV-126 CAN |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

On March 14, 2008, Plaintiff, Derrick Winston ("Winston"), filed his complaint in this Court. On July 29, 2008, Winston filed an opening brief, in which he asks this Court to enter judgment in his favor or to remand this matter to the Commissioner. On October 14, 2008, Defendant, Commissioner of Social Security ("Commissioner"), filed his response brief. On October 29, 2008, Winston filed his reply brief. This Court now enters its ruling based upon the record of this case that includes the pleadings, the motions, the administrative record, briefs of the parties, and the arguments of counsel.

**I.   PROCEDURE**

On September 16, 2003, Winston filed his application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") alleging a disability onset date of April 1, 2002. (Tr. 23). Winston claims he is entitled to benefits pursuant to Title XVI and Title II of the Social Security Act. See 42 U.S.C. §§ 216(I), 223, 1611, 1614. Winston's application was initially denied and again upon reconsideration. (Tr. 96-99, 92-94). On August 10, 2005, Winston appeared at a hearing before an Administrative Law Judge ("ALJ"). (Tr. 339). On June

2, 2006, the ALJ denied Winston's applications. (Tr. 68-74). On June 28, 2006, Winston filed a timely request for review with the Appeals Council and the ALJ's decision was vacated and remanded. (Tr. 49-52). On remand, the Appeals Council ordered the ALJ to reevaluate the treating psychiatrist's opinion, discuss Winston's mental impairment, and include a discussion about the global assessment functioning scores ("GAF"). (Tr. 23). On February 20, 2007, a remand hearing was held. (Id.). On July 24, 2007, Winston's claims were again denied. (Tr. 20-33). The ALJ found that Winston has the residual functional capacity ("RFC") to perform a restricted range of light work. (Tr. 27). Based on Winston's age, education, work experience, and RFC, the ALJ found that a significant number of jobs within the national economy existed that Winston could perform. (Tr. 32). Therefore, the ALJ found that Winston was not disabled. (Tr. 33).

Winston appealed the ALJ's decision to the Appeals Council. (Tr. 5-7 ). On December 13, 2007, the Appeals Council denied Bradley's request for review; and, as a result, the ALJ's decision became the Commissioner's final decision. (Id.). 20 C.F.R. § 404.981; Fast v. Barnhart, 397 F.3d 468, 470 (7th Cir. 2005). Consequently, Winston filed a complaint in this Court seeking a review of the ALJ's decision. This Court may enter a ruling in this matter based on the parties' consent, 28 U.S.C. § 636(c), and 42 U.S.C. § 405(g).

**II.   ANALYSIS**

   A.   Facts

At the time of the ALJ's decision, Winston was 44 years old with a high school level education as well as some electronics training. (Tr. 343). He has prior relevant work experience as a laborer for truss and masonry companies and as an assistant manager at an auto parts store.

(Tr. 112, 141). Winston claims that he has both physical and psychological impairments that prevent him from performing any of his past work or any other work in the economy. (Tr. 23)

Winston testified that he has never been able to hold a job for more than three years on account of issues relating to both depression and anger. (Tr. 384-84A). Winston stated that he had been fired or quit due to disputes with supervisors as well as missing work during episodes of depression. (Tr. 123-25, 345-49). Winston explained that, at times, he stays in bed until about two or three in the afternoon. (Tr. 354). He is able to do some cooking, laundry and dishes if it is not too much; and if he can take breaks as needed. (Tr. 388-89). Winston testified that taking walks sometimes helps his mood, but he is not always able to walk because of his knee problems. (Tr. 388).

Elaine Pasha ("Pasha"), friend of Winston, also testified at the trial as to his general behavior. (Tr. 23). Pasha testified that Winston reacts inappropriately in many instances and becomes easily angered. (Tr. 357-58). She reenforced Winston's testimony that he does not get out of bed on some days, especially if he is in a bad mood or the weather is bad. (Tr. 358-59). Pasha stated that Winston, at times, has trouble remembering things and will some times blame others and become aggressive. (Tr. 359-60).

    1.    Physical Impairments

        a.    Dr. Thomas P. Ryan ("Dr. Ryan")

Beginning in April 2004, Dr. Ryan saw Winston for various "orthopedic conditions including cervical neck pain with radiculopathy, left shoulder impingement syndrome, and hip pain." (Tr. 29). Dr. Ryan gave Winston steroid injections and ordered physical therapy to treat his shoulder impingement. (Id.). On April 17, 2004, Dr. Ryan tested Winston's eyes for

3

possible glaucoma; and, after diagnosis, Dr. Ryan saw Winston again for two follow up treatments. (Tr. 210-23). On August 26, 2004, Dr. Ryan performed a MRI scan of Winston's right knee, revealing degenerative changes of the medial joint space along with effusion and pain. (Tr. 235-39). In December 2004, Winston underwent knee surgery. (Tr. 231). In February 2005, Winston again complained of knee pain in which Dr. Ryan recommended surgery to replace his ACL. (Tr. 231). Additionally, Dr. Ryan ordered a course of physical therapy for Winston's neck. (Id.).

      b.      Dr. James O. Hartson ("Dr. Hartson")

On May 10, 2006, Winston saw Dr. Hartson for his recurring shoulder pain. (Tr. 338). Dr. Hartson determined that Winston had arthritis in his shoulder and ordered physical therapy but stating that surgery would be necessary later. (Tr. 333-38). In December 2006, a MRI of Winston's right shoulder revealed defects in the destal supraspinatus tendon with acromioclavicular joint arthritic changes. (Tr. 333). Additionally, Winston had follow-up visits for his glaucoma for "floaters," dry eyes, and light sensitivity. (Tr. 284-90). Winston also testified at the 2007 hearing that he would be undergoing a third knee surgery for his right knee. (Tr. 385-86).

   2.    Mental Impairments

      a.      Dr. Mohammed Arshad ("Dr. Arshad")

While Winston alleges both physical and mental impairments, his primary allegation is that his mental impairment prevents him from work. (Tr. 29). In September 2003, Dr. Arshad, Winston's treating physician, began seeing Winston on a monthly basis. (Tr. 172-75). Dr. Arshad diagnosed Winston with bipolar mood disorder and gave him a GAF score of 40 with a

guarded/poor prognosis.¹ (Id.). On August 9, 2005, Dr. Arshad completed a Medical Source Statement ("MSS"), the MSS is a check box form, indicating that Winston had

> moderate [limitations] defined as able to function satisfactorily in several areas including: understand[ing], remember[ing], and carry[ing] out short, simple instructions, understand[ing], remember[ing], and carry[ing] out detailed instructions, and mak[ing] judgments on simple work-related decisions. In addition, Dr. Arshad indicated that the [Winston had] marked [limitations] defined as serious limitations; ability to function is severely limited but not precluded in the following areas: interact[ing] appropriately with the public, supervisors, and co-workers, and respond[ing[ appropriately to changes and work pressures in a routine work setting.

(internal parens and quotations omitted)(Tr. 30, 281-83). Furthermore, Dr. Arshad opined that Winston "[could not] function in a team-oriented work environment." (Tr. 30, 282-83).

    b.  David L. Word ("Mr. Word")

Mr. Word, Winston's primary therapist, oversaw Winston's treatment by Dr. Arshad and progress at the Swanson Center. (Tr. 262-64). Mr. Word also diagnosed Winston with bipolar disorder and issued him a GAF score of 48. (Id.). On January 31, 2004, Mr. Word gave Winston a GAF of 45. (Tr. 252-58). In September of 2004, Mr. Word gave Winston a score of 50 and deemed Winston stable with hopes of improving mood swings. (Tr. 252-58). By July 2005, Mr. Word wrote a letter stating that Winston had responded significantly to treatment but still experienced some difficulty with life stressors and health issues; Mr. Word recommended Winston to continue treatment to stabilize his condition. (Tr. 242). Despite Winston's response to treatment, Mr. Word did not indicate that Winston was well suited for employment. (Tr. 245, 248, 250-51). In September 2005, Mr. Word issued Winston a GAF of 55 with a guarded

---

¹ According to the Diagnostic Manual, a GAF score's purpose is "reporting of overall functioning . . . [and is] particularly useful in tracking the clinical progress of individuals." See Tr. 30 (ALJ quoting from the AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (1994).

prognosis which has since improved. (Tr. 304-07). Additionally, Mr. Word noted that Winston had been able to control his "episodes of depression, anxiety, and violent rages." (Tr. 31). However, Mr. Word recommended continued treatment in order to control Winston's condition and to reduce the possibility of decompensation. (Id.).

    4.  Other Physicians

In addition to Winston's treating physicians, several other physicians examined him or reviewed his medical history. On October 3, 2003, Dr. Robert J. Walsh ("Dr. Walsh"), a consultative examiner, observed that Winston's bipolar disorder limited him to simple, repetitive tasks. (Tr. 31). Dr. Walsh issued Winston a GAF of 56 and indicated that Winston's depression was mild to moderate and could be treated with medication. (Tr. 167-69).

Two non-examining State agency psychologists also reviewed Winston's medical records. (Tr. 177-90, 191-204). On November 17, 2003, D. Unversaw, Ph.D. ("Unversaw") found Winston's condition to be not severe with only mild limitations. (Tr. 177-90). And on January 13, 2004, K. Neville, Ph.D. ("Neville") found Winston to have bipolar disorder with moderate difficulties in concentration, persistence and pace. (Tr. 191-208). Additionally, Neville noted that Winston had moderate limitations in the ability to understand, remember and carry out detailed instructions, perform activities within a regular schedule, be punctual and maintain attendance, complete a normal work week and respond appropriately to changes in the work setting. (Tr. 30, 206-08).

The major issues this Court must resolve are: whether the ALJ properly weighed the evidence of record, including the GAF scores and Dr. Arshad's opinion; whether the ALJ's

hypothetical to the VE were complete; and whether the ALJ properly assessed Winston's credibility.

B.  Standard of Review

The standard of review for an ALJ's decision is whether it is supported by substantial evidence and free of legal error. See 42 U.S.C § 405(g); Briscoe v. Barnhart, 425 F.3d 345, 351 (7th Cir. 2005); Haynes v. Barnhart, 416 F.3d 621, 626 (7th Cir. 2005); Golembiewski v. Barnhardt, 322 F.3d 912, 915 (7th Cir. 2003). Substantial evidence means such relevant evidence as a reasonable mind might accept to support such a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1972). A reviewing court is not to substitute its own opinion for that of the ALJ's or to re-weigh the evidence, but the ALJ must build a logical bridge from the evidence to his conclusion. Haynes, 416 F.3d at 626. An ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003). However, an ALJ's legal conclusions are reviewed *de novo*. Haynes, 416 F.3d at 626.

C.  Winston's Motion for Summary Judgment or Remand

To be entitled to benefits under 42 U.S.C. §§ 423, 1321a, Winston must establish that he was "disabled." See 42 U.S.C. § 423(a)(1)(D). The Social Security Act defines "disability" as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A). The Social Security regulations prescribe a sequential five-part test for determining whether a claimant is disabled. The ALJ must consider whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the

7

regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's RFC leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(I)-(v), 416.920; Briscoe, 425 F.3d at 352. If the ALJ finds that the claimant is disabled or not disabled at any step, he may make his determination without evaluating the remaining steps. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). If there is an affirmative answer at either step three or step five, then there is a finding of disability. Briscoe, 425 F.3d at 352. At step three, if the impairment meets any of the severe impairments listed in the regulations, the impairment is acknowledged by the Commissioner. See 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. app. 1, subpt. P, § 404. However, if the impairment is not so listed, the ALJ assesses the claimant's RFC, which in turn is used to determine whether the claimant can perform her past work under step four and whether the claimant can perform other work in society under step five. 20 C.F.R. § 404.1520(e). The claimant bears the burden of proof on steps one through four, but the burden shifts to the Commissioner at step five. Id.

The ALJ found that Winston's residual functional capacity allowed him to perform a restricted range of light work that existed in significant numbers in the national economy. (Tr. 27). The ALJ also determined that Winston is able to lift and carry twenty pounds occasionally and ten pounds frequently. (Id.). Additionally, the ALJ found Winston is not able to climb ladders, ropes, or scaffolds and is limited to performing simple, routine, or repetitive tasks. (Id.). Thus, the ALJ recommended that Winston should be assigned low-stress jobs with few changes in work settings as well as limited contact with co-workers. (Tr. 28).

1. <u>The ALJ's determination that the opinion of Winston's treating physician, Dr. Arshad, was internally inconsistent is not supported by substantial evidence.</u>

Winston contends that the ALJ erred by not properly weighing the evidence of record, in particular, the findings of Dr. Arshad. An ALJ is to give a treating physician's opinion controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and consistent with other substantial evidence in the record. <u>Hofslien v. Barnhart</u>, 439 F.3d 375, 376 (7th Cir. 2006). "This rule . . . seems to take back with one hand what it gives with the other, and as a result to provide little in the way of guidance to either." <u>Id.</u> More weight is generally given to the opinion of a treating physician because she is more familiar with the claimant's conditions and circumstances. 20 C.F.R. § 416.927(d)(2); <u>Clifford v. Apfel</u>, 227 F.3d 863, 870 (7th Cir. 2000). However, a claimant is not entitled to benefits merely because a treating physician labels her as disabled. <u>Dixon v. Massanari</u>, 270 F.3d 1171, 1177 (7th Cir. 2001).

Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence in the record. <u>Clifford</u>, 227 F.3d at 870. However, the ALJ must avoid substituting his own opinion for that of the treating physician without relying on medical evidence or authority in the record. 20 C.F.R. § 416.927(d)(2); <u>Clifford</u>, 227 F.3d at 870; <u>Rohan v. Chater</u>, 98 F.3d 966, 968 (7th Cir. 1996). When evidence in opposition to the presumption is introduced, the rule drops out and the treating physician's evidence is just one more piece of evidence for the ALJ to weigh. <u>Hofslien</u>, 439 F.3d.at 377. Unfortunately, there is no bright line for when a physician's opinion is inconsistent with other substantial evidence in the record, and it is essentially a case by case determination depending on the circumstances. <u>Id.</u>

In his decision, the ALJ made the following statement regarding Dr. Arshad's opinion:

[i]f Dr. Arhsad's marked limitations are interpreted as preventing all work, great weight is not given to Dr. Arshad's opinion. . . . and more weight is given to the longitudinal medical notes from Dr. Arshad which were written for objective and professional reasons, and not for the purpose of supporting a disability claim.

See Tr. 31. Further, the ALJ found that Dr. Arshad's notes did not indicate disabling limitations and, in fact, on several occasions Dr. Arshad listed Winston's condition as stable. Id. The ALJ compared Dr. Arshad's notes with Dr. Arshad's MSS assessment which indicated Winston "[was] easily frustrated, [was] easily agitated, and [had] difficulty working with others." Id. As such, the ALJ found that Dr. Arshad's MSS assessment and his treatment notes to be internally inconsistent. Id.

In most instances, medical evidence may be discounted if it is internally inconsistent. Clifford, 227 F.3d at 870. However, in instances of bipolar disorder, the physician's inconsistencies may actually be reflective of the disorder, which is episodic in nature. Bauer v. Astrue, 532 F.3d 606, 608-09 (7th Cir. 2008); Kangail v. Barnhart, 454 F.3d 627, 629 (7th Cir. 2006). In Bauer, the court held that, if a physician indicates a claimant cannot work full time but also notes that claimant is progressing, an ALJ should not automatically afford little weight to the physician's opinions because of the perceived inconsistencies. Bauer, 532 F.3d at 609. Instead, the ALJ should consider whether the physician's seemly inconsistent notes is a reflection of the disorder. Id. In Bauer, the court examined the ALJ's denial of disability benefits on the basis that one of the doctor's notes was inconsistent, noting that, while the doctor opined that the claimant could not perform any work, he also observed that claimant was doing

10

"fairly well" or "quite well" and her "reported level of function[ing] was found to have improved." Id.[2]

Similarly, in the immediate case, the ALJ discredited the opinion of Winston's treating physician, Dr. Arshad, because the ALJ concluded that Dr. Arshad's treatment notes were inconsistent with his opinion. See Tr. 31. As such, the ALJ decided to give Dr. Arshad's opinion, that Winston had "marked limitations," less weight. Id. However, the ALJ failed to take note that those suffering from bipolar disorder are likely to experience both good and bad days, as the Seventh Circuit has required in both Bauer and Kangail. See Bauer, 532 F.3d at 608-09; Kangail, 454 F.3d at 629.

Like the plaintiff in Bauer, Dr. Arshad noted that Winston had both good days and bad days. See Bauer, 532 F.3d at 609. Thus, regardless of Dr. Arshad's hopeful remarks about Winston's improvement, the ALJ should not have dismissed Dr. Arshad's opinion, regarding Winston's inability to work, as inconsistent without first providing some consideration and discussion of the episodic nature and effect of Winston's bipolar disorder. In conclusion, because the ALJ did not consider the episodic nature of Winston's mental illness in relation to the consistency of Dr. Arshad's treatment notes, the ALJ's decision to give lesser weight to Dr.

---

[2] In deciding to remand, the court found that the ALJ's decision "suggests a lack of understanding of bipolar disorder." Id. When someone suffers from a such a chronic disease that requires continuous treatment and medication, such a person is likely to have better and worse days, this is likely when a person has bipolar and "responds erratically to treatment." Id. Additionally, in Bauer, the court noted that, even if claimant was well half the time and could work but half the time the claimant was not well, "then [he] could not hold down a full-time job." Id. Thus, when dealing with a person who has bipolar disorder, it is the nature of the disorder to have better days and worse days and this should be taken into account when assessing a treating physician's notes regarding claimant's behavior. Id.

Arshad's opinion is not substantially supported. On remand, the ALJ will need to consider and discuss the episodic nature of Winston's bipolar disorder before determining whether to afford Dr. Arshad's opinion less weight. Such a discussion is necessary for the ALJ's conclusion to be consistent with the rule set forth in Bauer.

2. The ALJ's RFC is not supported by substantial evidence.

Winston additionally argues that the ALJ failed to properly assess his GAF scores. An ALJ is not required to evaluate every piece of evidence and testimony in writing, but the courts do require "a minimal level of articulation by the ALJ as to his assessment of the evidence . . . in cases which considerable evidence is presented." Stephens v. Heckler, 766 F.2d 284, 287 (7th Cir. 1985) (citing Zalewski, 760 F.2d 160,166 (7th Cir. 1985). In the immediate case, the ALJ noted that Winston had been given GAF scores ranging from 40 to 56. See Tr. 30. However, the ALJ indicated that Winston's activities suggest greater functionality. Id. In addition, the ALJ stated that, while "the Diagnostic Manual [includes] the evaluation standard that projects suggested values in comparable conditions. . . . in this case, there is no ready translation of the projections used by the psychologists and others." See Tr. 30. These statements indicate that there may only be generalized inferences of one's functioning based on these scores and as such are not an absolute indicator of a claimant's level of functioning. See Tr. 30. The ALJ also noted that the GAF scores incorporate other factors such as homelessness and unemployment and it is not readily discernable whether the scores represent functional limitations or overall symptom severity. Id.

Given that the GAF scores can be widely interpreted and that Winston's scores improved over time, the ALJ found that the GAF scores did not prevent Winston from performing all work.

See Tr. 30. The ALJ recognized that the GAF scores indicate Winston has severe mental impairments, but the ALJ noted that he has accommodated for these impairments by placing "non-exertional" limitations on Winston's work. Id. Consequently, this Court finds that the ALJ's determination regarding Winston's GAF scores was reasonable..

Further, Winston alleges that the ALJ did not point to any evidence to support his determination that Winston can perform light work. Despite Winston's argument, however, this Court finds that the ALJ's conclusion was supported by substantial evidence. In particular, the ALJ based his opinion that Winston could perform light work on Dr. Ryan's "conservative treatment" of Winston's knee and the lack of significant findings on MRI or x-ray. See Tr. 29. In addition, the ALJ noted that Winston's treatment for his knee and shoulder was "minimal" and the diagnostic imaging did not support "disabling limitations. Id. Further, the ALJ noted that Winston's shoulder impingement did not meet the durational requirement of twelve months and any residuals would be accommodated in his restriction to light work. Id. Also, the ALJ found that the "[e]vidence received since the June 2006 decision does not contain any medical findings that would impose more significant limitations." Id. Based on this evidence, the ALJ concluded that, based on Winston's physical impairment, he is able to perform light work. Given the significant amount of medical evidence, relied upon by the ALJ, this Court finds that the ALJ's analysis of both Winston's GAF scores as well as his physical impairments was reasonable.

However, despite the ALJ's proper consideration of Winston's physical impairments, because this Court has already determined that the ALJ must reconsider the weight afforded to

13

the opinion of Dr. Arshad, the ALJ may have to also reconsider his RFC determination on remand, consistent with his re-evaluation of that evidence.

3. The ALJ's determination regarding Winston's credibility was supported by substantial evidence.

Winston additionally alleges that the ALJ's determination of Winston's credibility is erroneous. Because an ALJ is in a special position where he can hear, see, and assess witnesses, an ALJ's credibility determinations are given special deference, and will only be overturned if they are patently wrong. Jens v. Barnhart, 347 F.3d 209, 213 (7th Cir. 2003). See also Prochaska v. Barnhart, 454 F.3d 731, 738 (7th Cir. 2006)(holding "[o]nly if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed.")(citations omitted). In addition, an ALJ is not required to provide a "complete written evaluation of every piece of testimony and evidence." Rice v. Barnhart, 384 F.3d 363, 370 (7th Cir. 2004) (quoting Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995)). However, an ALJ cannot simply state that an individual's allegations are not credible. Golembiewski, 322 F.3d at 915. Instead, Social Security Ruling 96-7p requires an ALJ to articulate specific reasons in a credibility finding. Golembiewski, 322 F.3d at 915; Steele v. Barnhart, 290 F.3d 936, 942 (7th Cir. 2002). Also, the ALJ may not simply recite the factors that are described in the regulations for evaluating symptoms. Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001). Further, when an ALJ's determinations are based on objective factors rather than subjective considerations, such as the claimant's demeanor, there is greater freedom to review the ALJ's decision. Clifford, 227 F.3d at 872.

In the immediate case, the ALJ found that Winston's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." See Tr. 28. In

14

particular, the ALJ found Winston's use of a cane and his reports of disabling headaches to be "significantly exaggerated and unsupported by medical records" and not expected to prevent work. See Tr. 29. In support, the ALJ noted that the objective medical evidence did not support Winston's subjective claims, and in fact, was far in excess of the medical documentation. Id. In addition, the ALJ based his decision on the fact that Winston had minimal treatment and his diagnostic imaging did not support disabling limitations. Id.

The ALJ discredited Winston's credibility because his symptoms seemed to be exaggerated and did not prevent all work. See Tr. 29. For instance, the ALJ stated that while Winston may experience headaches such headaches do not prevent unskilled work. Id. Likewise, the ALJ noted that no medical professional had prescribed a cane to Winston, despite his statement that he needs a cane to walk. Id. Additionally, the ALJ indicated that Winston's household activities suggested greater functionality than he let on in his testimony. This Court will not disturb a credibility finding unless it is patently wrong. Wolfe v. Shalala, 997 F.2d 321, 326 (7th Cir. 1993). Because the ALJ relied on substantial evidence in the record and sufficiently articulated his reason for discrediting Winston's testimony, this Court finds that the ALJ's credibility determination of Winston to be reasonable.

    4.    <u>The ALJ's hypothetical posed to the vocational expert was improper</u>.

Finally, Winston alleges that the hypothetical posed to the VE was incomplete. At step four, the ALJ must determine if the claimant has a RFC that permits him to perform his past work. 20 C.F.R. § 404.1520(e). In determining if the claimant can perform his past relevant work, the ALJ must compare the physical demands of the type of work with claimant's present capabilities. Strittmatter v. Schweiker, 729 F.2d 507, 509 (7th Cir. 1984). In step five, if the

15

claimant cannot perform his past relevant work, then the ALJ must determine if he can perform other work in society. 20 C.F.R. § 404.1520(g).

Because this Court has already determined that the ALJ must reevaluate Dr. Arshad's opinion and his resulting RFC determination, the ALJ must also reevaluate his hypothetical to include all of Winston's impairments, consistent with his conclusions regarding the weight afforded to Dr. Arshad's opinion.

### III. CONCLUSION

The ALJ's decision to give less weight to Dr. Arshad's opinion was not supported by substantial evidence because the ALJ failed to consider and discuss the possible effect of bipolar disorder's episodic nature on any perceived inconsistencies in Dr. Arshad's treatment notes. Accordingly, while the ALJ's findings regarding the analysis of Winston's GAF scores and his physical impairments were reasonable, the RFC determination was incomplete due to the ALJ's failure to fully consider Dr. Arshad's opinion. In contrast, the ALJ's analysis of the claimant's credibility was supported by substantial evidence because the ALJ found Winston's subjective complaints to be exaggerated, after reviewing the evidence of record. However, because of the ALJ's incomplete analysis of Dr. Arshad's opinion, the ALJ's RFC determination and resulting hypothetical need to be reevaluated. Consequently, this Court **GRANTS** Winston's motion. [Doc. No. 15]. Accordingly, this case is **REVERSED** and **REMANDED** to the Commissioner for proceedings consistent with this opinion pursuant to sentence four (4) of 42 U.S.C. § 405(g).

**SO ORDERED.**

Dated this 26th Day of February, 2009.

S/Christopher A. Nuechterlein  
Christopher A. Nuechterlein  
United States Magistrate Judge